**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Criminal No. 1:05-CR-135** |
| **Appellee** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| **GRANVILLE WHITE,** | : | |
| | : | |
| **Appellant** | : | |

**MEMORANDUM**

**I.   Introduction**

Granville White has appealed from a judgment of conviction imposed by Magistrate Judge J. Andrew Smyser under the Assimilative Crimes Act, 18 U.S.C. § 13.  On August 11, 2004, White was arrested at the New Cumberland Army Depot ("Army Depot") for driving a motor vehicle while his license was suspended due to a conviction for driving under the influence of alcohol.   Judge Smyser imposed a sentence of 75 days imprisonment, but White has remained on bond pending a determination of his appeal.

White makes only one argument in support of his appeal:  that the government presented insufficient evidence to establish an essential element of the offense charged, namely, that he was driving his motor vehicle on a "highway" or "trafficway" at the time he was stopped at the Army Depot.

**II.   Background**

The record reveals, and White does not contest, the following facts.  On August 11, 2004, White's driving privileges were suspended as a result of a DUI conviction.  On that date, White drove to the New Cumberland Army Depot for a pre-employment physical examination.   In order to reach

the Army Depot, White drove down Old Depot Road in Fairview Township, York County, Pennsylvania. As White drove down Old Depot Road, he was driving parallel to one side of the Army Depot, which is enclosed by a barbed wire fence located several feet off the road. Eventually, White arrived at a point where the barbed wire fence gave way to a gate which serves as the entry way for cars to access the Army Depot.

Located in front of the Army Depot's fence at this location is a large warning sign in bold red lettering that advises drivers as follows:

> **WARNING**
> **DEFENSE DISTRIBUTION CENTER**
> It is unlawful to enter this installation without
> the permission of the Activity Commander
> Section 21 of the Internal Security Act of 1950,
> 50 USC 797. While in this area, all personnel
> and the property under their control are subject
> to search. Possession of cameras, alcoholic
> beverages, and firearms are specifically prohibited
> unless authorized by the Activity Commander.
> ANY SUCH MATERIAL IS SUBJECT TO BE CONFISCATED

(Doc. No. 5, Ex. C.) White passed this sign unimpeded and turned on to Mission Drive through an open gate.[1] Mission Drive is the primary access road from Old Depot Road and traverses the Army Depot. Mission Drive has traffic signs, clearly marked traffic lines, and designated pedestrian walkways. (Id., at 10-15.)

Past the fence several yards along Mission Drive is an inclement weather booth staffed by Army Depot guards. The guards manning this booth stop all vehicles seeking entry to the Depot in

---

[1] This gate may be opened or closed, depending upon military security needs. During trial, there was testimony that the fence is generally closed once a week. (Doc. No. 5, Ex. D, Transcript of Trial at 19.)

order to conduct an identification check. (Id., at 21.) Drivers and passengers seeking admission to the Army Depot are typically employees of the facility or those seeking employment within the Depot. (Id., at 22.) All persons stopped at the booth must advise federal officers as to where they will be going within the Depot.[2] (Id.) Officers permit entry only to visitors with specific permission to enter the Depot for particular authorized purposes. (Id., at 21-22.)

During the morning of August 11, 2004, federal police officer Michael Nallo and a fellow officer were stationed at the inclement weather booth identified during trial as Post 3. (Id., at 6-7.) After White drove past the electric fence bearing the warning sign, he was directed to stop his vehicle at Post 3. At this point, Officer Nallo approached White's car and requested identification and a driver's license. (Id., at 7.) After checking White's identification, Officer Nallo learned that White's license had been suspended for driving under the influence of alcohol. (Id., at 7-8.) Officer Nallo issued White a citation, charging him under the Pennsylvania Vehicle Code with driving with a suspended license (DUI) in violation of 75 Pa. C.S. § 1543(b)(1) as an assimilated federal offense pursuant to 18 U.S.C. § 13.

### III.  Procedural Background

White pleaded not guilty to the offense charged and on November 17, 2004, Judge Smyser conducted a bench trial. White's single argument during the trial was that he did not violate §

---

[2] It appears from the record that guards are not posted at the weather booth just inside the barbed wire fence during the evening. (Transcript, at 20.) Officer Michael Nallo testified that during the evening there are no officers stationed at the weather booth. However, Officer Nallo testified further that anyone seeking to drive into the Army Depot during evening hours would be stopped "further up the road" and it would have been a crime for such persons to have entered the Depot without permission. (Id., at 20-21.)

1543(b)(1) because the government could not establish an element necessary to the charged offense: namely, that the offense occurred while White was driving on a "trafficway." White asserted that he was stopped by Officer Nallo while inside the Army Depot on an interior federal road that was not open to the public. (Id., at 27-35.) After taking evidence and hearing argument by the parties, Judge Smyser found Defendant guilty of the offense charged. (Id., at 36.) Judge Smyser did not specifically address Defendant White's challenge, but found that all essential elements of the crime charged had been proven. On April 7, 2005, White was sentenced to seventy-five days imprisonment, a $500 fine, and a $10 special assessment. On April 1, 2005, White filed a timely notice of appeal.

### IV.    Jurisdiction and Standard of Review

This Court has jurisdiction over this appeal pursuant to 18 U.S.C. § 3402. The standard of review applicable to review of a magistrate judge's decision is identical to that employed by the court of appeals on an appeal from a conviction in district court. Fed. R. Crim. P. 58(g)(2)(D). Under a challenge to the sufficiency of the evidence, the Court's standard of review is "particularly deferential." United States v. Hedaithy, 392 F.3d 580, 604 (3d Cir. 2004) (quotation omitted). The verdict must be sustained if there is substantial evidence to support the decision. Id. at 605 (citation omitted). The Court may overturn a verdict only if "after viewing the evidence in the light most favorable to the prosecution," no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

### V.    Discussion

The Assimilated Crimes Act, 18 U.S.C. § 13(a) ("ACA") provides, in relevant part, that:

> any act or omission which, although not made punishable by any

> enactment of Congress, would be punishable if committed or
> omitted within the jurisdiction of the State, Territory, Possession,
> or District in which such place is situated, by the laws thereof in
> force at the time of such act or omission, shall be guilty of a like
> offense and subject to a like punishment.

18 U.S.C. § 13(a). The ACA "transforms a crime against the state into a crime against the federal government." United States v. Kiliz, 694 F.2d 628, 629 (9th Cir. 1982) (citing United States v. Press Publishing Co., 219 U.S. 1 (1911)). Accordingly, prosecution under the ACA is prosecution of a federal, rather than a state, crime. United States v. Collazo, 117 F.3d 793, 795 (5th Cir. 1997). The ACA "fills gaps in the law applicable to federal enclaves, ensures uniformity between criminal prohibitions applicable within the federal enclave and within the surrounding state, and provides residents of federal enclaves with the same protection as those outside its boundaries." United States v. Hall, 979 F.2d 320, 322 (3d Cir. 1992) (citing United States v. Sharpnack, 355 U.S. 286 (1958) and Kiliz, 694 F.2d at 629).

Defendant does not dispute the authority of the United States Government to prosecute him pursuant to the ACA. Rather the crux of Defendant's argument is that when the state crime of driving under suspension based on an alcohol-related offense is properly assimilated, the Government cannot meet, and has not met, its burden of proof beyond a reasonable doubt on each of the elements of the charge.

The relevant Pennsylvania statute prohibiting driving with a license suspended for alcohol-related reasons, 75 Pa. C.S. § 1543(b)(1), provides:

> A person who drives a motor vehicle on a highway or trafficway
> of this Commonwealth at a time when the person's operating
> privilege is suspended . . . for driving under the influence of

>     alcohol . . . shall, upon conviction, be guilty of a summary
>     offense and shall be sentenced to pay a fine of $500 and to
>     undergo imprisonment for a period of not less than 60 days nor
>     more than 90 days.

75 Pa. C.S. § 1543(b)(1).  Accordingly, under state law, in order for a defendant to be found guilty of violating this statute, each of the following material elements must be established beyond a reasonable doubt:  (1) that the defendant was driving a motor vehicle; (2) that when the driver was operating the motor vehicle his driving privileges were suspended for driving under the influence of alcohol; and (3) that the defendant was driving "on a highway or trafficway of this Commonwealth." Id.  White has conceded the first two elements, and argues only that the government failed to prove that the road on which Officer Nallo stopped him was a highway or trafficway.

>     The Pennsylvania Vehicle Code defines a "highway" as:
>
>> The entire width between the boundary lines of every way publicly
>> maintained when any part thereof is open to the use of the public
>> for purposes of vehicular travel.  The term includes a roadway open
>> to the use of the public for vehicular travel on grounds of a college
>> or university or public or private school or public or historical park.

75 Pa. C.S. § 102.  The Pennsylvania Vehicle Code defines a "trafficway" as:

>     The entire width between property lines or boundary lines of every
>     way or place of which any part is open to the public for purposes of
>     vehicular travel as a matter of right or custom.

Id.[3]

---

[3]   At trial, and in the parties' briefs, there appears to be agreement that the Army Depot road at issue in this case is more akin to a trafficway than a highway.  (Transcript, at 24.) Notwithstanding this general agreement, the parties disagree on whether Mission Drive is, in fact, a trafficway in within the meaning set forth in the Pennsylvania Vehicle Code.

Pennsylvania courts have interpreted these definitions broadly to encompass a variety of different roads and structures.  See, e.g., Commonwealth v. Zabierowsky, 730 A.2d 987 (Pa. Super. Ct. 1999) (public parking garage); Commonwealth v. Cameron, 668 A.2d 1163 (Pa. Super. Ct. 1995) (apartment building parking lot containing sign indicating for tenants only); Commonwealth v. Procter, 625 A.2d 1221 (Pa. Super. Ct. 1993) (shopping mall parking lot); Commonwealth v. Cozzone, 593 A.2d 860 (Pa. Super. Ct. 1991) (condominium parking lot); Commonwealth v. Karenbauer, 574 A.2d 716 (Pa. Super. Ct. 1990) (back road/alley way accessing homes and public buildings); Commonwealth v. Wilson, 553 A.2d 452 (Pa. Super. Ct. 1989) (Elks Club parking lot, marked private by sign, but open to public by custom); Commonwealth v. Baughman, 516 A.2d 390 (Pa. Super. Ct. 1986) (one-lane dirt road through field).

Appellant argues that these cases "teach – consistent with simple common sense – that if members of the public can drive into and on a location with minimal restrictions, then that location is 'open to the public' and thus a 'trafficway'." (Doc. No. 4, at 10.)  However, White contends that none of the foregoing cases address the circumstances of the present case, and asserts that the Army Depot is an entirely different location from those found in the above cases to constitute trafficways.  In particular, White points to the following distinctions he claims prevent Mission Drive from being considered a trafficway:  the Army Depot uses signage that specifically warns drivers that they must have permission of the Activity Commander to enter the Depot and that unauthorized permission is punishable as a misdemeanor; visitors essentially waive their Fourth Amendment rights against searches and seizures when they enter the Depot; the entire Army Depot is enclosed in barbed wire fencing; the entrance along Old Depot Road may be closed by an electric fence controlled by Army Depot

personnel; and the entrance to the Depot is guarded by two federal police officers who check driver identification before permitting entry.

White also cites to United States v. Edwards, No. 89-5641, 891 F.2d 284 (3d Cir. 1989), an unpublished decision in which a panel of the Third Circuit vacated a conviction of a motorist who had been arrested after he was observed driving out of a parking lot and down two roads at the Army Depot while his license was suspended due to an arrest for driving while intoxicated. In Edwards, the government presented no other evidence to support the conclusion that Edwards had been driving in an area open to the public for vehicular travel. Nevertheless, the trial judge found that element had been proven beyond a reasonable doubt, and relied on the following facts: (1) the parking lot had an assigned number; (2) the streets on which Edwards was driving were named; and (3) the officer who arrested Edwards was in a marked vehicle. The Third Circuit reversed the conviction, disagreeing with the trial judge's analysis, and noted that "the most reasonable inference" was that the record did not support that the Army Depot was open to the public. Id. at 7. In making this finding, the Court noted evidence in the record that suggested restrictions on access to the Army Depot, and determined that Pennsylvania case law focusing on "whether the areas are open to the public as a matter of right or custom" did not support a finding that the Army Depot was open to the public. Id. at 5-6.

As an initial matter, Edwards is an unpublished decision and is therefore not binding upon this Court for purposes of deciding the instant appeal. Furthermore, the Court finds that the facts of this case are materially different from those presented in Edwards. Unlike in that case, Appellant was not operating a motor vehicle within the Depot. Rather he was driving on the main access road leading to the guard station, where he was ultimately stopped before he could gain entrance to the interior of the

Depot. The evidence of record clearly supports a finding that the portion of Mission Drive on which Defendant was stopped was "open to the public for purposes of vehicular travel," as it appears to be one of the only ways the public can seek admission to the Depot. Indeed, other than passing by a warning sign, nothing in the record suggests that White encountered any restrictions on this stretch of Mission Drive until he reached the guard booth where he was stopped by Officer Nallo. At trial, Officer Nallo testified that the portion of Mission Drive spanning the fence to the guard station is typically closed only once a week, and is generally open during daytime and evening hours, and is not staffed by any officers or guards. (Transcript, at 19-20.) Whatever may be the character of the Army Depot <u>past</u> the booth where White was apprehended – within the Army Depot – is irrelevant to a determination of whether the location where White was actually stopped should be considered a trafficway for purposes of 75 Pa. C.S. § 1543(b)(1).

White acknowledges that "[t]he only circumstance in which federal prosecution would be proper here would be if federal officers stopped White inside the base on a road that was, in fact, a 'trafficway' 'open to the public' – as federal officers do routinely on 'open to the public' roads in, for example, federal parks." (Doc. No. 4, at 15.) The record contains sufficient evidence to conclude that is precisely what happened in this case: White was apprehended at the inclement weather booth along a stretch of Mission Drive open to the general public for purpose of vehicular travel. As such, the Court finds that the record contains sufficient evidence that White was driving on a trafficway within the meaning of 75 Pa. C.S. 1543(b)(1) at the time he was stopped at the inclement weather booth along Mission Drive. Accordingly, White's appeal must be denied, and his conviction affirmed.

Moreover, even were the Court to find that the location on Mission Drive where White was

9

apprehended was not open to the general motoring public, the Court would nonetheless find that the government proved all elements of 75 Pa. C.S. § 1543(b). This is so because the Court finds that the question of whether a particular road is "open to the public" must be answered by reference to the particular context in which the roadway is situated. Although the Third Circuit has not ruled on the precise issue of whether a roadway's public or non-public character should be determined through such inquiry, other courts have persuasively followed such an approach in circumstances similar to those presented in the case at bar.

In <u>United States v. Kiliz</u>, the Ninth Circuit affirmed a defendant's conviction under the ACA for operating a motor vehicle without a license in the Puget Sound Naval Shipyard. <u>Kiliz</u>, 694 F.2d at 628. The defendant in <u>Kiliz</u> argued, <u>inter alia</u>, that he could not be prosecuted under the ACA because the relevant state statute required that the offense be committed on a public highway, and defendant contended that roadways within the naval shipyard could not be construed as public highways because access to them was limited. <u>Id.</u> at 630. In rejecting Defendant's argument, the court of appeals explained:

> Defendant first argues that the plain meaning of the phrase "public highway" excepts the statute from application within the restricted shipyard. Yet defendant fails to explain how the tautological term "public highway" should be read any differently than the word "highway" standing by itself. It is incorrect to rely as heavily as defendant does on the word "public" because all "highways" are by definition public. . . . <u>The relevant public in this case is the apparently large number of people who use the roadways of the shipyard daily</u>. This includes, presumably, military personnel and civilian workers. The roadway's use, at least on the record before this Court, does not seem to be lacking in this "public" character.

Id. at 630 (emphasis added).  In finding that a roadway's public or non-public character should be determined by examining the context of the roadway and the particular federal enclave in which it is situated, the Ninth Circuit relied in part on a district court opinion finding that roadways within McClellan Air Force Base were public highways within the meaning of the relevant state statute:

> The roadways on McClellan Air Force Base are ways or places used for purposes of vehicular travel.  They are publicly maintained, being maintained by the sole sovereign which has jurisdiction over the area, namely, the United States.  They are open to the public, subject only to reasonable restrictions and regulations.  Certain members of the general body of the people of the State of California, who have no business upon the base, may be barred from using the roadways in the industrial portion of the base.  However, the general body of the people of McClellan Air Force Base, who work or reside there, have a general right to use the roadways, subject to reasonable restrictions and regulations.  These roadways clearly come within the definition of "highway" when a realistic application of the term is made.

Id. at 630-31 (quoting United States v. Barner, 195 F. Supp. 103, 105 (N.D. Cal. 1961)).  Noting that defendant's offense "was simply driving while his license was revoked," which was "the offense against which those in federal enclaves need protection," the Court summarized its analysis as follows:

> This Court is thus unable to agree with the defendant that the restricted nature of the roadway on which the defendant was arrested deprived it of the "public" character necessary for conviction under the ACA.  Defendant surely could not have believed that he would not be prosecuted on the base if he were caught driving after his license had been suspended for the third time.  Defendant, in order to reach the federal enclave, illegally drove on state roads and would have continued on state roads after he left the base if he had not been arrested.  It would render the ACA and its conformity policy meaningless if the defendant could not be prosecuted in federal court for the identical offense on the roads in the federal enclave as he had only moments before perpetrated on the state roads.

Id. at 632.

The Court finds the reasoning of Kiliz persuasive, and rejects Defendant's argument that the government was required to prove that the location where White was apprehended "has a customary use by the general public." (Transcript, at 5) (emphasis added.)  To adopt Defendant's argument would require the Court to find that the federal government lacks any power under the ACA to prosecute those who drive along roadways within military installations while intoxicated or while their licenses are suspended for alcohol-related reasons.[4]  The Court finds such an approach would ignore one of the fundamental purposes of the ACA to provide those persons within federal enclaves with the same protections as those existing outside of their boundaries.  In this case, the record, although somewhat limited, contains substantial evidence that would support a finding that Mission Drive, within the context of the Army Depot, could be considered a public trafficway within the meaning of 75 Pa. C.S. § 1543(b) as assimilated under the ACA.  For this additional reason, the Court finds that Defendant's conviction must be affirmed.  An appropriate order follows this opinion.

---

[4] Furthermore, Defendant's argument that a federal public roadway be open to the general public before a crime under 75 Pa. C.S. § 1543(b) may be assimilated is predicated on an assumption that the state statute must be literally assimilated.  However, such an assumption leads to potentially absurd results.  By its very nature, the ACA cannot incorporate every aspect of the underlying state offense.  For example, section 1543(b) requires that the conduct occur on a "highway or trafficway of this Commonwealth."  To require the government to prove this underscored element would negate assimilation of this offense to any federal territory.  The Ninth Circuit recognized the absurdity of such an argument: "All public highways within a federal enclave and outside of the jurisdiction of the State of Washington are not 'of this state.'  Defendant would have us thus rule, based upon his literal approach, that the prohibitions of R.C.W. 46.20.342 could not be applied to any roadway within a federal enclave.  We decline to accept such a result."  Kiliz, 694 F.2d at 630.  The same can be said of this case.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** : | | |
| : | **Criminal No. 1:05-CR-135** | |
| **Appellee** : | | |
| : | **(Judge Kane)** | |
| **v.** : | | |
| : | | |
| **GRANVILLE WHITE,** : | | |
| : | | |
| **Appellant** : | | |

## ORDER

**AND NOW**, this 5th day of July 2005, upon consideration of the appeal of appellant Granville White (Doc. No. 1), **IT IS HEREBY ORDERED THAT**:

1. The appeal is **DENIED**.

2. The March 22, 2005 judgment of conviction in <u>United States v. White</u>, No. 1:04-MJ- 056-74 (M.D. Pa.) is **AFFIRMED**.

3. Appellant shall voluntarily surrender to the United States Marshal at the institution designated by the Marshal on July 7, 2005 at or before 1:00 p.m. to begin serving his sentence of imprisonment for a term of 75 days imposed by Magistrate Judge Smyser.

4. The Clerk of Court shall close the file.

       S/ Yvette Kane
Yvette Kane
United States District Judge